UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| IN RE: | CASE NO. |
|---|---|
| GRAND SEAS RESORT PARTNERS, a Florida general partnership, | CHAPTER 11 |
| Debtor. | |

## MOTION OF THE DEBTOR-IN-POSSESSION FOR AUTHORITY TO USE CASH COLLATERAL AND REQUEST FOR EXPEDITED HEARING

### (*EMERGENCY HEARING REQUESTED*)

The above-captioned Debtor-in-Possession (the "Debtor"), by and through its undersigned proposed attorney, and pursuant to the provisions of section 363(c)(2) of Title 11 of the United States Code (the "Bankruptcy Code"), does hereby file its *Motion for Authority to Use Cash Collateral and Request for Expedited Hearing* ("Motion"), and in support of this Motion, state as follows:

### BRIEF STATEMENT OF RELIEF REQUESTED

1. By this Motion, the Debtor requests that this Court enter an order authorizing the Debtor to use cash collateral in accordance with the budget attached hereto as Exhibit "A."

2. Approval of the instant Motion is necessary and critical to the Debtor's ongoing business operation, as well as for the preservation of asset and collateral value.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A) and (M).

4. The statutory predicate for the relief requested herein is sections 105, 361, 362, and 363 of the Bankruptcy Code.

## GENERAL BACKGROUND

A. **Organizational Background**

5. The Debtor is a Florida general partnership owned by Grand Seas M, Inc. and IBER, LLC - each owns a 50% general partnership interest. Grand Seas M, Inc. is the Debtor's managing general partner.

B. **Business Operations**

6. The Debtor is engaged in the marketing and sales of timeshare condominium units, the ownership of food service. The Debtor contracted with a property manager who was responsible for managing the property for the benefit of timeshare and other users as well as providing services for the homeowners' association.

7. The Debtor's operations are situated on 800 feet of oceanfront property located at 2424 North Atlantic Boulevard, Ormond Beach, Florida 32174. The operations include 175 guest rooms, banquet and restaurant facilities, 3 pools and other common elements.

8. The Debtor owns the developer retained property consisting of parking lots, restaurants, meeting rooms, and the lobby. The Debtor also owns a portfolio of 850 unsold timeshare units – each comprises 1 week's usage – with an estimated value of $4,950,000.00, as well as the Consumer Loan Documents (hereafter defined) executed and provided in connection with previously sold timeshare units. The balance outstanding under the Consumer Loan Documents is approximately $19,000,000.00.

9. In a typical transaction involving the sale of a timeshare unit, the Debtor sells a timeshare unit, ordinarily consisting of 1-week usage of a condominium unit. The purchaser

pays a down payment of 10-20%, with the balance represented by a promissory note and mortgage (collectively, the "Consumer Loan Documents"). The promissory note is typically for a 10-year term with an annual interest rate of 16.9%.

10. Historically, the Debtor contracted with sales and marketing and management companies. The sales and marketing agent handled the marketing and sales of timeshare units for a fee based on a percentage of the gross sales price. The management company handled the front-desk services, housekeeping, maintenance and other services on behalf of the homeowners' association. The management company invoiced and was paid by the homeowners' association in consideration for the services provided.

C.  **Pre-Petition Financing**

11. Prior to the Petition Date, the Debtor entered into a loan and security agreement dated December 19, 2003 with Textron Financial Corporation ("Textron"), as amended on May 26, 2004, May 25, 2005, December 14, 2005, August 20, 2007 and May 2, 2008 (collectively the "Textron Loan Documents"). Pursuant to the Textron Loan Documents, the Debtor was able to borrow up to $28,000,000.00.

12. Under the Textron Loan Documents, Textron advanced 90% of the amount represented by the promissory note under the Consumer Loan Documents. In exchange for the financing, the Debtor pledged the Consumer Loan Documents as collateral to Textron. By way of example, the Debtor sells a timeshare unit for $10,000.00. In consideration for the timshare unit, the purchaser pays a $2,000.00 down payment to the Debtor (which is retained by the Debtor for operations), and the balance of the purchase price, or $8,000.00, is represented by a promissory note and mortgage (the Consumer Loan Documents). Textron then advances an amount equal to 90% of the outstanding balance, or $7,200.00 to the Debtor, in exchange for

which the Debtor pledges the Consumer Loan Documents as collateral. In accordance with the Textron Loan Documents, consumers make payments under the Consumer Loan Documents directly to a third-party servicing agent. All payments received on account of the Consumer Loan Documents are applied under the Textron Loan Documents first to interest and then to principal.

13. As of August 31, 2009, Textron was owed approximately $14,200,000.00. The Debtor believes the book value of the pledged collateral is approximately $19,000,000.00. In considering the value of its collateral, it is believed that Textron only includes the value of the "eligible" pledged receivables, which is defined as those receivables under 60-days. The estimated value of the "eligible" pledged receivables is approximately $15,200,000.00.

D. **Events Precipitating Bankruptcy**

14. In or about January 2009, Textron ceased financing under the Textron Loan Documents. Absent financing, and in light of the fact that payments made pursuant to the Consumer Loan Documents are made directly to a third-party servicing agent and applied in their entirety to the debt owed to Textron, the Debtor was forced to operate without a substantial portion of operating revenue. Since such time, Textron has prevented the Debtor from pursuing enforcement of the Consumer Loan Documents and, therefore, the Debtor has been unable to pursue collection or foreclosure remedies. Historically, when the Debtor foreclosed on a timeshare unit, the Debtor was able to resell the timeshare unit. Consequently, the Debtor has not only been prevented from pursuing enforcement remedies, but the Debtor has lost the ability to convert a non-performing asset into a performing asset.

15. The homeowners' association maintains that it overpaid for certain services and asserts a claim against the prior management company for approximately $700,000.00. The homeowners' association asserts a claim against the Debtor for unpaid fees in the amount of

approximately $500,000.00 relating to the Debtor's portfolio of timeshare units. The homeowners' association maintains the foregoing have hampered its ability to pay for certain services. The homeowners' association, by and through the prior management company, invoiced timeshare unit owners for association fees at year-end and collected the fees through the first quarter of each year.

16. As a result of the foregoing, the Debtor has recently taken steps to make arrangements for a new management company, effective January 2010, when the homeowners' association will presumably have sufficient funds to pay for ongoing services. In the meantime, the Debtor will provide the management services and invoice the homeowners' association, but will likely offset against fees to be invoiced on account of the portfolio of unsold timeshare units owned by the Debtor.

**E.    Retention of CRO**

17. In or about July 2009, the Debtor retained a consultant to assist the Debtor in analyzing and working out its operation. In light of the consultants working knowledge of the Debtors' operations, assets, financials and dealings with Textron, the Debtor elected to retain the consultant as a chief restructuring officer in order to assist with the Debtor's reorganization efforts.

**FACTS IN SUPPORT OF RELIEF REQUESTED**

18. By this Motion, the Debtor seeks an order authorizing the Debtor to utilize cash collateral in order to operate the Debtor's business. Textron asserts a lien against collections on account on the Consumer Loan Documents, which, in the event the lien is valid, represent cash collateral within the meaning of section 363 of the Bankruptcy Code.

19. The Debtor seeks authority to use cash collateral in accordance with the budget

attached hereto as Exhibit "A"  Exhibit "A" represents both (a) the "interim budget" (the "Interim Budget") which will govern use of cash collateral pending a final hearing on this Motion (the "Interim Period") in order to avoid immediate and irreparable harm to the estate, and (b) the budget which will govern use of cash collateral following a final hearing on this Motion (the "Budget")(the Interim Budget and Budget are hereinafter collectively referred to as the "Budgets").

20.     During the Interim Period, the Debtor projects the following: (a) total receipts in the amount of approximately $225,000.00 representing cash collateral; (b) total receipts in the amount of approximately $88,000.00 not representing cash collateral (including a beginning cash balance in the amount of approximately $20,000.00); and (c) total disbursements in the amount of approximately $166,911.67 – primarily for wages, insurance and taxes.

21.     The Debtor requests that the Court conduct a preliminary hearing pursuant to Federal Rule of Bankruptcy Procedure 4001(b)(2) and authorize the Debtor to use cash collateral on an interim basis pending a final hearing in accordance with the Interim Budget.

22.     The Debtor requests that the Court conduct a final hearing and authorize the Debtor's use of cash collateral in accordance with the Budget.

23.     It is essential to the continued operation of the Debtor's businesses for the Debtor to have the ability to utilize cash collateral. Without the use of cash collateral to continue the Debtor's business, the Debtor will be required to discontinue its business operations.

24.     The Debtor believes that adequate protection will be provided through the maintenance of existing collateral levels or otherwise. The proposed utilization of cash collateral will not, in any event, impair Textron's position.

25.     The Debtor estimates the total value of the pledged collateral to be approximately

$19,600,000.00. The value of Textron's asserted secured claim is approximately $14,200,000.00. Therefore, the Debtor submits that Textron has a sufficient equity cushion, as more fully set forth below, to support the granting of the authority to use cash collateral sought herein.

26. There is insufficient time for a full hearing to be held before the Debtor must use cash collateral. If this Motion is not considered on an expedited basis, and if the Debtor is denied the ability to immediately use cash collateral, there will be a direct and immediate material and adverse impact on the continuing operation of the Debtor's business and on the value of its assets. In order to continue its business operations in an effort to achieve a successful reorganization, the Debtor must use cash collateral in its ordinary business operations. The inability of the Debtor to meet its ordinary business expenses will require the Debtor to discontinue normal operations, which will result in irreparable injury to the Debtor and could negatively impact the Debtor's chances for a successful reorganization. Any such discontinuation would also materially and adversely impact the value of any collateral. Indeed, it is in the best interest of Textron that the Debtor be authorized to use its cash collateral.

27. If allowed to use cash collateral, the Debtor believes it can maintain its business operations.

## AUTHORITY IN SUPPORT OF RELIEF REQUESTED

28. Pursuant to Section 363(c)(2)(B) of the Bankruptcy Code, a debtor-in-possession may use cash collateral with court approval after notice and a hearing. 11 U.S.C. § 363(c)(2)(B). Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used by a debtor, the Court "shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Here, the

18420222v1 903970 71604

Court should approve the Debtors' proposed use of cash collateral because Textron's interests in cash collateral will be more than adequately protected during the Debtor's continued business operations.

29. Adequate protection can be provided by a number of different methods. Section 361 of the Bankruptcy Code provides that adequate protection may be provided by (1) making "a cash payment or periodic cash payments to [an] entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title . . . results in a decrease in the value of [the] entity's interest in such property," (2) "providing to [an] entity an additional or replacement lien to the extent that such ... use . . . results in a decrease in the value of [the] entity's interest in such property" or (3) "granting such other relief . . . as will result in the realization by [an] entity of the indubitable equivalent of [the] entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3). Adequate protection may also be provided or otherwise realized by the existence of an equity cushion in the collateral.

30. What constitutes adequate protection is determined on a case-by-case basis. See MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). However, regardless of how adequate protection is provided, the focus of the requirement is to protect a secured creditor from diminution in value of its interest in the collateral during the period of use by the debtor. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Ass'n & Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

31. Simply stated, adequate protection is necessary only to the extent the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such

property." 11 U.S.C. §§ 361, 363(e); See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" securing the claim). As the court in In re Megan Racine Assoc., Inc., 202 B.R. 660 (Bankr. N.D.N.Y. 1996) noted:

> Adequate protection . . . is intended to compensate a creditor for any decrease in the value of its security interest in collateral during the pendency of the debtor's reorganization that is due to the imposition of the stay or is traceable to the use of such property.

Id. at 663.

32. Textron is only entitled to protection against the decline in value of its security interests in prepetition collateral resulting from the Debtor's use of cash collateral. The equity cushion that exists in excess of the outstanding secured debt provides Textron with more than sufficient adequate protection within the meaning of sections 361 and 363(e) of the Bankruptcy Code.

33. The interests of Textron are adequately protected by an equity cushion. The existence of value in collateral in excess of the amount of the secured claim (i.e., an equity cushion) provides the classic form of protection for secured debt and can itself provide sufficient adequate protection. See Pistole v. Mellor (In re Mellor), 734 F.2d 1396; In re Llewellyn, 27 B.R. 481 (Bankr. M.D. Pa. 1983); Dixie-Shamrock Oil & Gas, Inc., 39 B.R. at 117-118 (holding that equity cushion of $500,000 on $7.1 million debt provided adequate protection); In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980 (holding that 10% equity cushion provided adequate protection); In re Elmira Litho, Inc., 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994); In re McKillips, 81 B.R. 454, 458 (N.D. Ill. 1987); In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del. 1984).

34. In determining the existence and extent of an equity cushion, most courts value

18420222v1 903970 71604

the collateral on a going concern or fair market value basis. See, e.g., In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 74-75 (1st Cir. 1995) (valuing creditor's interest in property to be retained by debtor at its "going-concern or fair market value with no deduction for hypothetical costs of sale"); In re McClurkin, 31 F.3d 401, 405 (6th Cir. 1994); In re Automatic Voting Machines Corp., 26 B.R. 970 (Bankr. W.D.N.Y. 1983); In re OPL Components, Inc., 20 B.R. 342 (Bankr. E.D.N.Y. 1982).

35.   It is particularly appropriate for a bankruptcy court to value collateral on a going concern or fair market value basis early in a bankruptcy case so the debtor is provided an opportunity to reorganize, and any doubt should be resolved in favor of facilitating the debtor's attempt at reorganization. In re A&B Heating & Air Conditioning, Inc., 48 B.R. 493, 496 (Bankr. N.D. Fla. 1985); In re Hoffman, 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985); In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). As the Heatron court stated in granting the debtor's motion to use cash collateral:

> The policy of the Code, as with the predecessor statutes, is to encourage reorganization if there is a reasonable possibility of success.... At the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting.

Id. at 496. The court in O'Connor, 808 F.2d 1393 summarized the principle as follows:

> Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estates, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor .... are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral should be permitted during the early stages of administration. The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the

proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

Id. at 1397-98; see also In re Sun Valley Newspapers, Inc., 171 B.R. 71, 75 (Bankr. 9th Cir. 1994) (the debtor should be given substantial latitude during the initial phases of the case if it is plausible that it can propose a confirmable plan).

36. Here, Textron enjoys an equity cushion because the estimated total value of the Debtor's pledged collateral on a fair market valuation basis is approximately $19,600,000.00 and the value of Textron's secured claim is approximately $15,200,000.00.

37. This equity cushion is more than sufficient adequate protection for the use of cash collateral requested herein. See, e.g., In re Monnier, 755 F.2d 1336, 1340 (8th Cir. 1985) (25% equity cushion was adequate); In re Industrial Valley Refrigerating and Air Conditioning Supplies, 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (equity cushion of approximately 50% was adequate); McKillips, 81 B.R. at 458 (equity cushion of 20% or more almost always constitutes adequate protection); In re Boulders on the River, Inc., 164 B.R. 99, 104 (9th Cir. BAP 1994) (11.45% equity cushion was adequate); In re McGowen, 6 B.R. 241 (Bankr. E.D. Pa. 1980) (10% equity cushion was adequate).

38. In light of the foregoing, the Debtor submits that the use of cash collateral is appropriate in accordance with the Budgets attached hereto as Exhibit "A", and that the interests of all creditors will be adequately protected by the existence of an equity cushion.

## REQUEST FOR PRELIMINARY HEARING

39. The Debtor requests that the Court conduct an emergency hearing pursuant to Federal Rule of Bankruptcy Procedure 4001(b)(2) and further conduct a final hearing on not less than 15 days notice.

18420222v1 903970 71604

## RESERVATION OF RIGHTS

40. By submitting this request, the Debtor does not waive any rights, including without limitation the right to object, challenge or contest the extent, validity or priority of Textron's prepetition lien(s).

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order granting the Motion, scheduling a preliminary hearing on the Motion at the earliest practicable time, authorizing the interim use of cash collateral in the operation of its business, and scheduling a final hearing in order to authorize the Debtor's use of cash collateral, as well as granting such other and further relief that the Court may deem just and proper.

**RESPECTFULLY SUBMITTED** this ____ day of September 2009.

*I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).*

18420222v1  903970  71604

## CERTIFICATE OF EXIGENT CIRCUMSTANCES

**I HEREBY CERTIFY** that an emergency hearing has been requested, since the relief requested is critical to the administration of this estate and to the Debtor's business operations in connection with this case commenced on September 8, 2009.

**HINSHAW & CULBERTSON, LLP**
Proposed Attorneys for Debtor-in-Possession
One East Broward Boulevard, Suite 1010
Ft. Lauderdale, Florida 33301
Telephone: (954) 467-7900
Facsimile: (954) 467-1024

By: ___*s/Michael D. Seese*___
     Michael D. Seese, Esq.
     Fla. Bar No. 997323
     mseese@hinshawlaw.com

18420222v1 903970 71604